UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11812-RGS

CYNTHIA M. BAKER

v.

MICHAEL J. ASTRUE, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

August 11, 2010

STEARNS, D.J.

    Cynthia Baker is appealing the decision of the Commissioner of Social Security that she was not a disabled person under the implementing regulations of the Social Security Act as of March 5, 2004.  See 20 C.F.R. § 404.1520.  Although an Administrative Law Judge (ALJ) initially made a finding of no disability, Baker was subsequently found disabled in a second application for benefits accompanied by new medical evidence. The issue on appeal is whether substantial evidence corroborates the Commissioner's decision that Baker's disability onset date was February 12, 2006, rather than March 5, 2004.  The appeal is brought pursuant to 42 U.S.C. § 405(g).  A hearing was held on July 30, 2010. For reasons to be stated, the case will be remanded to the Commissioner for an additional finding of fact.

## BACKGROUND

    Baker applied for Social Security Disability Insurance (SSDI) Benefits and Supplemental Social Security Income (SSI) Benefits on April 27, 2005.  Trial Record (Tr.)

at 64-72.   She claimed permanent disability as of March 5, 2004, resulting from a combination of depression, mental illness, diabetes, and hypertension.   Tr. at 113.   On March 27, 2006 ALJ Gerald Resnick heard testimony from Baker (who was represented by an attorney), and from a vocational expert.   Tr. at 17.   On April 19, 2006, the ALJ issued his decision, finding that although Baker "cannot perform her past relevant work because of her impairments," the existence of other jobs she was capable of performing in the national economy meant she did not have a disability as defined in the Social Security Act.   Tr. at 21, citing 20 C.F.R. §§ 404.1520(g) & 416.920(g).

Baker was fifty years old on the date of the ALJ's decision.   Tr. at 64.   She has a high school diploma and completed one year of college.   Tr. at 343.   From 1997 to 2004, Baker worked as a customer service representative for a health insurance company.   Tr. at 114.   She claimed no other work experience during the prior fifteen years.   Id.   On March 5, 2004, Baker stopped working because of an inability to cope with job-induced stress and anxiety.   Tr. at 345.   She has not worked since.   At the time of the hearing, Baker was living with a friend in Taunton, Massachusetts.

Mental Impairments

After leaving her job in March of 2004, Baker was treated over the next six months for depression and insomnia by Dr. Walter Fitzhugh, who prescribed the anti-depressants Lexapro, Bupropion, Paxil, Seroquel, and a sleep-aid, Ambien.   Tr. at 116.   When Baker moved to Massachusetts from Rhode Island in 2005, she began receiving mental health treatment at Community Care Services (CCS).   Tr. at 172.   In her initial intake form dated January 19, 2005, Baker reported that her depression began in January of 2004.   Id.   She also complained of anxiety beginning in November of 2004.   Tr. at 173.   On February 1,

2005, Baker began seeing a nurse practitioner at CCS, Karen Gardner, who diagnosed her with recurrent major depression and prescribed another anti-depressant, Prozac.  Tr. at 174, 177.  Gardner also assessed Baker with a Global Assessment of Functioning (GAF) score of 55.[1]  Tr. at 174.  At her next visit on February 9, 2005, Baker's diagnosis was unchanged and she was again assessed to have a GAF score of 55.  Tr. at 179.  On March 3, 2005, after a regularly scheduled therapy session, Gardener reported that Baker's symptoms of depression were still present, but diminished.  Tr. at 181.  On April 7, 2005, Baker continued to report symptoms of depression with slight improvement and was prescribed a higher dosage of Prozac.  Tr. at 182.  On May 10, 2005, after a therapy session, Gardner switched Baker from Prozac back to Paxil.  Tr. at 183.

On May 18, 2005, Baker completed a Residual Functional Capacity (RFC) self-assessment in support of her benefits application.  Tr. at 96-103.  She complained of poor short-term memory, an inability to focus, trouble sleeping without medication, crying when stressed, and a fear of leaving home and interacting with strangers.  Tr. at 96-103.  Baker did not describe any difficulties responding to authority figures or fear of losing employment as a result.  Tr. at 101-102.  Despite her mental impairments, Baker reported being able to prepare her own meals, groom herself, care for her pet hamsters, complete chores (with reminders), shop for groceries, and take medication (with reminders).  Tr. at 96-99.  For

---

[1]The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.  The GAF score range between 51 and 60 is described as "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (DSM-IV-TR).

leisure, Baker stated she watched television, talked with others, and visited the local community center on a regular basis.  Tr. at 100.

On June 7, 2005, Gardener and a supervising physician, Dr. Victor Komry, completed an RFC assessment of Baker.  Tr. at 208-210.  They collectively opined that she was markedly limited in her ability to work because of a variety of symptoms caused by depression.  Id.  Although, Gardener and Dr. Komry completed the checkbox portion of this form, they rendered no detailed opinion regarding Baker's mental RFC.  Tr. at 210.  At a visit to CCS on June 21, 2005, Baker complained of memory loss, trouble sleeping, and suicidal ideation.  Tr. at 185.  Gardener as a result increased her Paxil dosage.  Id.

On July 21, 2005, a psychological evaluation of Baker was completed by Dr. Richard Vinacco, Jr., on behalf of Disability Determination Services (DDS).[2]  Tr. at 147.  Baker reported a "major" depression that had lasted for three years.  Tr. at 149.  She also complained of "daily" anxiety, but had not suffered panic attacks.  Id.  "She indicated that she stopped [working] secondary to 'the pressures.  They were too great.  I was losing my mind.  I could not concentrate and I cannot remember things, even now.'" Tr. at 148.  Testing determined Baker's short and long-term memory to be intact.  Tr. at 150.  She was able to understand directions, follow instructions, and answer questions without difficulty.  Tr. at 149.  Her thought process was logical, concrete, and goal-directed.  Tr. at 150.  She was oriented in all spheres.  Tr. at 150.  Dr. Vinacco concluded that Baker suffered from depression, but did not exhibit any signs of anxiety.  Tr. at 151.

---

[2]DDS is a program of the Massachusetts Rehabilitation Commission that is fully funded by the Social Security Administration (SSA) to determine the eligibility of Massachusetts applicants for SSDI and SSI.

On July 28, 2005, a second DDS psychologist, Dr. Carol McKenna, completed a mental RFC assessment based on a review of Baker's medical records.  Tr. at 166-169.  Dr. McKenna found Baker's "[a]llegations [to be] credible but do not preclude . . . functioning."  Tr. at 168.  She diagnosed Baker to have recurrent major depression with symptoms of anxiety, but not of sufficient severity to be disabling.  Tr. at 170.

Baker's depressive state remained unchanged during appointments at CCS from July 28, 2005, through January 24, 2006.  Tr. at 186-187, 224-227.  On March 14, 2006, Gardner and Dr. Komry completed a second RFC assessment where they again opined that Baker's depression markedly limited her ability to work.  Tr. at 228-230.  They further provided in a narrative that "client reports decreased activity and [increased] symptoms of depression and anxiety."  Tr. at 230.

Physical Impairments[3]

On June 8, 2005, during a routine examination with her primary care physician, Dr. Elizabeth Monteiro, Baker complained of leg pain.  Tr. at 125.  Dr. Monteiro recommended an orthopedic evaluation.[4]  Id.  During an interview with a DDS psychologist, Dr. Vinacco, on July 21, 2005, Baker reported that "I fall down a lot."  Tr. at 150.  She further explained that she would fall while walking or bending.  Tr. at 148.[5]  On November 7, 2005, Baker was

---

[3]Although Baker initially claimed diabetes and hypertension as disabling ailments, the current appeal is limited to her claims of depression and multiple sclerosis.

[4]The results of the examination, if one was conducted, do not appear in the record.

[5]The Commissioner insists in his brief that the falls were "because of problems with depth perception due to glaucoma."  Comm'r's Br. at 6.  The record is not nearly so clear.  Dr. Vinacco's report quotes Baker as stating: "When questioned about medical conditions, Ms. Baker reports, 'Diabetes, high blood pressure, overweight.  I fall down a lot.  My depth perception is off.  I get dizzy.  I have glaucoma.'"  Tr. at 148.  In context, Baker was giving a laundry list of her ailments rather than assigning a cause to any one of them.  Further,

admitted to the emergency room at Morton Hospital in Taunton, Massachusetts, three days after a fall that injured her left knee.  Tr. at 250.  She was prescribed Vicodin and began using a cane at the recommendation of the Morton Hospital treating physician.  Tr. at 251.  Baker continued to use the cane to cope with her unsteady balance on the instructions of Dr. Monteiro.  Tr. at 349.  Baker's continued reports of problems with her balance are reflected in a treatment note from her endocrinologist, Dr. James A. Warshaw, on November 29, 2005: "The patient does participate in exercise such as walking, but has frequent falls."  Tr. at 262.  Dr. Warshaw also reported complaints of numbness, burning, and pain in Baker's legs, which he believed to be neuropathy associated with her diabetes.  Tr. at 262-263.

<u>THE ALJ'S DECISION</u>

ALJ Resnick made the following pertinent written findings on April 16, 2006.

1.    The claimant met the disability insured status requirements of the Act on March 5, 2004, the date the claimant stated she became unable to work, and continues to meet them through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since March 5, 2004.

3.    The medical evidence establishes that the claimant has severe depression, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.    The degree of incapacity asserted by the claimant as resulting from her impairments is not consistent with the record considered as a whole.

5.    The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for

---

no medical expert has indicated anywhere in the record that glaucoma was a contributory factor in Baker's falls.

the ability to lift 50 pounds occasionally and 25 pounds frequently; to sit for at least 6 hours out of an 8 hour work day; to stand and/or walk for at least 6 hours out of an 8 hour work day; to operate arm and leg controls without restriction; to climb, stoop, kneel and crouch, but to avoid balancing and crawling; and with the ability to perform simple, routine competitive, repetitive tasks on a substantial basis over a normal 8 hour work day in a stable work environment, with no more than simple decision making, and with no significant interaction with the public; and with an inability to perform complex and detailed tasks, but able to perform tasks requiring a low degree of concentration consistent with the limitations above (20 CFR 404.1545 and 416.945).

6.      The claimant is unable to perform her past relevant work as [a] customer service representative.

7.      The claimant's residual functional capacity for a significant range of at least light to medium work is reduced by the ability to sit for at least 6 hours out of an 8 hour work day; to stand and/or walk for at least 6 hours out of an 8 hour work day; to operate arm and leg controls without restriction; to climb, stoop, kneel and crouch, but to avoid balancing and crawling; and with the ability to perform simple, routine competitive, repetitive tasks on a substantial basis over a normal 8 hour work day in a stable work environment, with no more than simple decision making, and with no significant interaction with the public; and with an inability to perform complex and detailed tasks, but able to perform tasks requiring a low degree of concentration consistent with the limitations above.

8.      The claimant is 48 to 50 years old, which is defined as ranging from a younger individual to closely approaching advanced age (20 CFR 404.1563 and 416.963).

9.      The claimant has a high school education (20 CFR 404.1564 and 416.964).

10.     Transferability of skills is not germane to the issue of disability.

11.     Based on an exertional capacity for at least light work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rules 202.14 and 202.21, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12.     Although the claimant's nonexertional limitations do not allow her to perform the full range of light to medium work, using the above-cited

rule as a framework for decisionmaking, there are a significant number of jobs existing in the national economy which she could perform.  Examples of such jobs are: small parts assembler, inspector, packer, and jigger, and numbered in excess of 12,000 positions in the Southeastern Massachusetts/Rhode Island regional economy.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 21-23.

Diagnosis of Multiple Sclerosis

On April 14, 2006, after the hearing before the ALJ (and two days before his opinion issued), Baker was referred for an MRI exam because of complaints of loss of balance and an "unstable gait."  Tr. at 239, 252.  She reported that her symptoms had begun "at least a year" before.  Tr. at 239.  The MRI exposed "extensive white matter loss seen in both hemispheres emanating from the periventricular regions outward.  There is also the suggestion of a small punctate acute infarct high in the left parietal lobe as well as some parenchymal loss in the corpus callosum.  These changes may be due to a demyelinating process such as [multiple sclerosis] . . . ."  Tr. at 252.  On May 11, 2006, Baker visited Dr. Bharani Padmanabhan, a neuroimmunologist and the Director of the Multiple Sclerosis Service at Angels Neurological Centers.   Tr. at 238.   During her visit with Dr. Padmanabhan, Baker had multiple physical complaints.

[S]he feels off-balance when she goes in the shower or when she turns suddenly.  She is constantly putting her hand out to stabilize herself . . . . She fell about a year ago and had a knee contusion.  She also has burning in her thighs that comes and goes, especially in the evenings and at night.  She is stiff all over when she wakes up in the morning, especially in the arms and legs, but not in the hands themselves, and has to thaw out a little bit.  She states that this also started approximately 1 ½ years ago at around the same time as the balance trouble.

Tr. at 239.   After analyzing the earlier MRI, Dr. Padmanabhan concluded, "I think this woman really does have multiple sclerosis, and has probably had it for some years."   Id. A second MRI on January 11, 2007, confirmed the initial diagnosis.   Tr. at 260.   On February 22, 2007, Dr. Padmanabhan completed a disability form for DDS.   Tr. at 275.   He diagnosed Baker with "RR-MS" (relapsing-remitting multiple sclerosis) and listed the "date of first signs of illness" as 2004.   Id.   Dr. Padmanabhan went on to describe Baker's prognosis as "unknown - usually a decline is inevitable."   Id.

Initial Award of Benefits

Baker was initially awarded benefits for a disability as of April 20, 2006, after submitting a supplementary application for benefits.   Baker's Br. at 4.[6]   The application was approved by the Social Security Administration (SSA) on June 8, 2007, after a finding of a disability by a DDS psychologist, Dr. Kathryn Collins-Wooley.   On May 7, 2007, Baker met with Dr. Collins-Wooley for a mental RFC evaluation in connection with her second application for benefits.   Tr. at 311-323.   Dr. Collins-Wooley's notes acknowledged Baker's diagnosis of multiple sclerosis.   Tr. at 323.   They go on to state:

> 51 yo with depression in the context of chronic illness.   Despite psych treatment she is persistently irritable and withdrawn.   She requires reminders and is too anergic and preoccupied to read or to manage simple chores in a timely manner.

Id.   Dr. Collins-Wooley concluded that Baker met the depression listing (12.04) defining a per se disability under the Social Security Act.   Tr. at 311.   Dr. Collins-Wooley indicated an estimated onset date of November of 2004 for Baker's disabling depression. Tr. at 323.

First Appeals Council Decision

---

[6]This award does not appear in the record.

Following the initial award of benefits, Baker continued to seek benefits under her original claim by filing a timely appeal with the Appeals Council on November 6, 2006.[7] The Appeals Council awarded disability benefits as of February 12, 2006 – the date of Baker's fiftieth birthday.[8]

> The Appeals Council concurs with the hearing decision finding that the claimant's mental impairment limits her to simple, unskilled work. In addition, the claimant has been diagnosed with multiple sclerosis and this is supported by an MRI of the brain obtained on April 14, 2006. Furthermore, physical examinations performed in August and December 2006 showed the claimant had a wobbly gait, and another examination in December 2006 revealed a wobbly gait and poor balance. Based on this diagnostic and clinical evidence, the Appeals Council finds that commencing February 12, 2006, several months before the first evidence of multiple sclerosis with a supporting MRI report, the claimant was limited to unskilled sedentary work. . . . The claimant attained age 50 on February 12, 2006 and she had the residual functional capacity for unskilled sedentary work. Rule 201.14 in Appendix 2 is applicable commencing February 12, 2006 and that rule directs a conclusion of disabled.

Tr. at 8 (citations omitted).

Appeal to District Court and Second Appeals Council Decision

Because Baker had exhausted her administrative remedies with the Appeals Council's decision, this action was brought pursuant to 42 U.S.C. § 405(g). See Baker v. Astrue, No. 07-cv-12095-RGS (D. Mass. filed Nov. 5, 2007). The case was remanded to the Appeals Council on May 30, 2008, at the request of the parties because of a lack of

---

[7]Although an appeal of an ALJ's decision must ordinarily be taken within sixty days of a ruling, there was an excusable delay resulting from the late notice given to Baker of ALJ Resnick's decision.

[8]Under a grid in the applicable regulations, Baker had a lower burden for proving disability upon reaching age fifty as an "individual approaching advanced age." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(g). "When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferrable skills, a finding of disability ordinarily obtains." Id.

required finding on the issue of Baker's credibility.  Tr. at 379-385.  On August 28, 2008,

the Appeals Council reaffirmed its earlier decision.

> An MRI dated April 14, 2006 supported a diagnosis of multiple sclerosis. There is very little evidence of a physical impairment prior to February 2006. Although the claimant complained of dizziness, falling, and depth perception problems, *there is no evidence of any emergency room admissions related to falls*, and physical examinations prior to February 2006 do not support the claimant's allegations.  Examinations in May 2006, August 2006 and December 2006 first reflect clinical abnormalities consistent with significant abnormalities related to multiple sclerosis. The Appeals Council adopts the subjective complaint analysis provided in the hearing decision in accordance with Social Security Ruling 96-7p and 20 CFR 404.1529 and 416.929, including consideration of the medical evidence, the type of treatment received, and the support for the allegations found in the record.  The Appeals Council therefore finds that the claimant's subjective complaints for the period prior to February 12, 2006 are not supported by the evidence of record, and she was not disabled during that period.

Tr. at 377 (citations omitted) (emphasis added).

## DISCUSSION

The findings of the Commissioner are conclusive so long as they are supported by

substantial evidence and so long as the Commissioner has applied the correct legal

standard.  See 42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of Health & Human Servs., 76

F.3d 15, 16 (1st Cir. 1996).  "Substantial evidence . . . means evidence reasonably

sufficient to support a conclusion.  Sufficiency, of course, does not disappear merely by

reason of contradictory evidence. . . . [The] question [is] not which side [the court] believe[s]

is right, but whether [the Commissioner] had substantial evidentiary grounds for a

reasonable decision . . . ."  Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir.

1998).  The Commissioner's findings "are not conclusive when derived by ignoring

evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater,

172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

11

On appeal, Baker asserts that the Appeals Council's decision is not supported by substantial evidence because: (1) it disregarded the opinion of its own medical expert without medical evidence to the contrary; (2) its determination of Baker's credibility was not supported by specific facts; and (3) the decision rendered a medical opinion that was beyond the Appeals Council's competence.

I.      Treatment of DDS Psychologist's Opinion

Baker argues that the disregard by the Appeals Council of Dr. Collins-Wooley's diagnosis of a November 2004 onset date for her disabling depression in favor of the arbitrarily selected February 12, 2006 onset date was not supported by substantial evidence.  The Appeals Council held that

> [a]lthough the Massachusetts Disability Determination Services (DDS) found . . . that the claimant's impairments met the requirements of Section 12.04 in Appendix 1, and thus, she was disabled based on medical considerations alone, this finding is not well supported by the objective evidence. Examinations in August 2006 and December 2006 described the claimant's mental status as good or very good, and mental status examination in April 2007 did not reflect abnormalities consistent with a finding of disability.  Some depression and memory deficits were noted, but no other abnormalities were found.

Tr. at 8.  Baker argues that it was improper for the Appeals Council to disregard Dr. Collins-Wooley's medical opinion without obtaining or consulting a contrary opinion.  "The [factfinder is] not at liberty to ignore medical evidence or substitute [its] own views for uncontroverted medical opinion."  Nguyen, 172 F.3d at 35.  "As a lay person, . . . the [factfinder is] simply not qualified to interpret raw medical data . . . ."  Id.

Although Baker cites the rule correctly, she misapplies it.  The Commissioner fairly points to medical evidence that contradicted Dr. Collins-Wooley's opinion.  Dr. Collins-Wooley had found that Baker had a mental impairment that met listing 12.04

because she had depressive syndrome resulting in marked limitations in two areas: (1) social functioning and (2) maintaining concentration, persistence, and pace. Tr. at 311, 321. See also 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04 (in order to meet the listing, a claimant must, in relevant part, meet the A criteria and have marked limitations in at least two areas listed in the B criteria).

As to social functioning, Gardner's treatment notes consistently indicate that Baker was getting along well with others.   Tr. at 181, 183, 185, 186-187, 224-227.   Although Gardner felt that Baker had difficulty relating to co-workers without being distracting or exhibiting behavioral extremes, she also believed that Baker was either not significantly limited, or only moderately limited, in all other areas of social functioning.  Tr. at 209, 212. Gardner also twice assessed Baker with a GAF score of 55 (Tr. at 174, 179) indicating only "moderate difficulty in social, occupational, or school functioning." DSM-IV-TR 34.  The two DDS psychologists who reviewed Baker's records and completed mental RFC assessments concluded that, while she was overly sensitive to criticism, she was nonetheless capable of appropriate social interactions in a work setting.  Tr. at 168, 204. Baker stated that she was uneasy around others (Tr. at 101-102), but she also reported that she visited with friends and regularly socialized at her community center.  Tr. at 100. She also reported no difficulties in interacting with authority figures, nor had she ever been fired from a job because of an inability to adjust to co-workers.  Tr. at 101-102.

Substantial evidence also supports the conclusion that Baker did not have marked limitations in the areas of concentration, consistency, and pace.   It is true that Baker reported problems with concentration.   Tr. at 96-103, 148, 183.   However, during the examination by Dr. Vinacco in 2005, she was able to understand directions, comply with

13

instructions, and answer questions without difficulty.  Tr. at 149.  See also Tr. at 101 (self-report acknowledging ability to follow short instructions).  Her memory was intact. Tr. at 150.  Her GAF scores of 55 indicated only moderate symptoms or impairment overall.  Tr. at 174, 179.   Additionally, the two previous DDS psychologists who reviewed Baker's records and completed mental RFC assessments also concluded that she could maintain concentration, consistency, and pace adequate to perform simple tasks.  Tr. at 168, 204.

The court agrees that there was substantial evidence supporting the Appeals Council's finding of a depression onset date of February 12, 2006.  While there may be disagreement between Dr. Collins-Wooley and other doctors about Baker's diagnosis, this is a matter left to the Commissioner's discretion.  See Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

II.   Credibility of Baker

Baker argues that the Appeals Council improperly relied on the ALJ's determination of her credibility as support for its findings.  This is unreasonable, according to Baker, because the ALJ did not know (and could not have known) of her diagnosis of multiple sclerosis.  The ALJ is not required to accept a claimant's subjective complaints at face value.  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 22-23 (1st Cir. 1986); 20 C.F.R. § 404.1529.  He must, however, state specific reasons for questioning a claimant's credibility.  DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).[9]

"In determining the severity of a claimant's [symptoms], 'the absence of objective medical evidence supporting an individual's statements about the intensity and persistence

---

[9]"[A] Court will not save [a] decision by inserting the basis for a finding where there was not substantial evidence to support it and no specific finding justifying it as a rational result." Rohrberg v. Apfel, 26 F. Supp. 2d 303, 310 (D. Mass. 1998).

14

of . . . symptoms *is only one factor* that the adjudicator must consider in assessing an individual's credibility.'" Makuch v. Halter, 170 F. Supp. 2d 117, 127 (D. Mass. 2001) (emphasis in original), quoting Social Security Ruling (SSR) 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, at *6 (S.S.A. July 2, 1996).  If after evaluating the objective findings, the ALJ determines that the claimant's reports of symptoms are significantly greater than what could be reasonably anticipated from the objective evidence, the ALJ must then consider other relevant information. Avery, 797 F.2d at 23. Considerations capable of substantiating subjective complaints of symptoms include evidence of:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; and (5) any other factors relating to claimant's functional limitations and restrictions due to symptoms. Id. at 22; 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).  Issues of credibility and the resolution of inconsistencies in the record are for the Commissioner and not the court to resolve.  Rodriguez, 647 F.2d at 222.

Baker does not argue that her multiple sclerosis should affect the onset date of her claims of mental impairment.  Rather, Baker contends that "[w]ith the diagnosis of multiple sclerosis, her difficulties standing, walking, using a cane/walker and headaches are within the normal disease process and very credible." Baker Br. at 14.  The Appeals Council in its Second Decision acknowledged that Baker "complained of dizziness, falling, and depth perception problems," but did not credit these complaints because it found that "there is no evidence of any emergency room admissions related to falls, and physical examinations prior to February 2006 do not support the claimant's allegations." Tr. at 377.  The Appeals

Council then adopted the ALJ's skeptical analysis of Baker's credibility.  Id.  The Commissioner notes that Baker's multiple sclerosis diagnosis was taken into account by the Appeals Council in its Second Decision.  See id. ("Examinations in May 2006, August 2006 and December 2006 first reflect clinical abnormalities consistent with significant abnormalities related to multiple sclerosis.").

The court agrees with Baker that the Appeals Council's assessment of her credibility was inadequate for two reasons: (1) the Appeals Council was mistaken in its characterization of the record; and (2) the ALJ's credibility analysis never addressed Baker's multiple sclerosis diagnosis.  The Appeals Council discredited Baker's complaints of dizziness, falling, and depth perception problems because of the purported absence of "any emergency room admissions related to falls."  Id.  However, the record indicates that Baker was admitted to the emergency room at Morton Hospital on November 7, 2005 for an injury to her left knee sustained from a fall.[10]  Tr. at 250.  The ALJ's credibility determination, on which the Appeals Council also relied, was made before the multiple sclerosis diagnosis.  Without the medical records concerning Baker's multiple sclerosis, the ALJ was deprived of objective medical evidence relevant to Baker's complaints of loss of balance and dizziness.  See Tr. at 347-349.  While the omission is explained by the chronology of events, "when such evidence is obtained, [the adjudicator] must consider it in evaluating the individual's statements."  SSR 96-7p, 1996 WL 374186, at *6.

III.   Improper Medical Opinion

---

[10]At the ALJ hearing, Baker described her balance problems at some length.  Tr. at 347-349.  She also mentioned having her knee x-rayed after "fall[ing] down off the lip of a doorway, over it" and her need to use a cane afterward.  Tr. at 349.  Although she stated that she "believe[d]" the date of this visit was January of 2006, she was almost certainly referring to the November 7, 2005 hospital visit.

Baker's final argument is that the Appeals Council rendered an improper medical opinion in determining the onset date of her disability as it relates to her multiple sclerosis. In establishing the February 12, 2006 onset date, the Appeals Council noted that "[t]here is very little evidence of a physical impairment prior to February 2006." Tr. at 377. The SSA has issued guidance on the determination of onset dates for conditions like multiple sclerosis.

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established.

SSR 83-20, Titles II and XVI: Onset of Disability, 1983 WL 31249, at *2 (S.S.A. 1983). The inference of an onset date is not undertaken lightly.

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

Id. at *3.

Here, Baker argues that there is no evidence to support the February 12, 2006 onset date selected by the Appeals Council, and that it should have called on a medical expert to make the determination of when her multiple sclerosis became disabling. The

Commissioner objects to the need for any further medical consultation: "although [Baker] reported problems with balance (Tr. 148, 226), she nonetheless had relatively few physical complaints, had relatively mild objective medical findings, and was able to engage in a wide range of activities throughout the time period at issue in this case (Tr. 96-103, 123, 126-127, 131-132, 148, 177, 263, 265)."  Comm'r's Br. at 19-20.

The court, however, agrees with Baker that an additional finding is required.  Dr. Padmanabhan is the only doctor in the record to offer an opinion as to the onset date of Baker's multiple sclerosis, which he fixed as well prior to February 12, 2006.  See Tr. at 239 ("I think this woman really does have multiple sclerosis, and has probably had it for some years."), 275 ("date of first signs of illness: 2004").  Unfortunately, this does not resolve the matter.  "It is not enough for a claimant to establish a diagnosis of a condition; it is incumbent upon the claimant to prove that the condition was *disabling* at the relevant time period." Carmichael v. Bowen, 1990 WL 136120, at *3 (6th Cir. Sept. 20, 1990) (emphasis in original) (specifically, multiple sclerosis).  The record is devoid of any medical expert's opinion as to when, or even if, Baker's multiple sclerosis became a disabling condition.[11] Where the medical evidence is inadequate to support a reliable determination of disability, the Commissioner has an affirmative obligation to insure that gaps in the record are filled. This is not a matter of discretion, but a duty imposed by the implementing regulations.  See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2001).

ORDER

---

[11]The implementing regulations of the Social Security Act recognize three categories of symptoms of multiple sclerosis as potentially disabling: disorganization of motor function, visual or mental impairment, and significant fatigue demonstrated on physical examination. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.09A-C.

For the foregoing reasons, Baker's motion to remand is <u>ALLOWED</u> for further development of the record with respect to the issue of the disability onset date, if any, of her multiple sclerosis.  The Commissioner's cross-motion for an order of affirmance is <u>DENIED</u>.  The Clerk will remand the case to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE